Merrimack
No. 2000-682

ERNEST T. SMITH, III & a.

v.

NEW HAMPSHIRE DEPARTMENT OF REVENUE ADMINISTRATION & a.

Argued: June 5, 2002
Opinion Issued: November 25, 2002

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*Michael C. Harvell* and *Elizabeth A. Bailey* on the brief, and *Mr. Harvell* orally), *Upton & Hatfield, LLP*, of Concord (*Russell F. Hilliard* on the brief), *McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Wilbur A. Glahn, III* and *Andrea L. Daly* on the brief), *Wiggin & Nourie, P.A.*, of Manchester (*W. Wright Danenbarger* on the brief), *Rath, Young & Pignatelli, P.A.*, of Concord (*William F. J. Ardinger* and *Christopher J. Sullivan* on the brief), and *Ansell Professional Association*, of Bedford (*David E. Barradale* on the brief), for the petitioners.

*Philip T. McLaughlin*, attorney general (*Anne E. Edwards*, senior assistant attorney general, on the brief and orally) and *Gallagher, Callahan & Gartrell*, of Concord (*Walter L. Maroney* on the brief), for the respondents.

DALIANIS, J. The petitioners, a class of similarly situated taxpayers, appeal the Superior Court's (*McGuire*, J.) ruling that they were not entitled to a refund of the New Hampshire interest and dividend tax (I&D tax) paid during the 1991 through 1994 tax years on interest and dividends from out-of-state non-bank investment sources. We affirm.

## I. Relevant Facts

This case is before us again after remand. *See Smith v. N.H. Dep't of Revenue Admin.*, 141 N.H. 681 (1997) (*Smith I*). We recite only a brief history of the facts necessary to decide this appeal.

The I&D tax was enacted in 1923. Until 1995, interest and dividends derived from investments in New Hampshire state banks, trust companies, building and loan associations, credit unions or national banks with a New Hampshire branch were exempt from the I&D tax. *See* RSA 77:4, I-II (1991) (amended 1995). The legislature repealed these exemptions in 1995. *See* Laws 1995, ch. 188.

The petitioners are a class of New Hampshire residents who paid I&D taxes on interest and dividends earned on out-of-state investments from 1991 through 1994. These out-of-state investments included: (1) the full range of bank deposits in out-of-state banks; (2) stock in out-of-state stock banks; (3) stock in out-of-state bank holding companies; (4) municipal, state and federal government bonds; (5) treasury bills; (6) corporate bonds; (7) publicly traded stock; and (8) cash equivalents, such as money management accounts, maintained by brokerages.

In 1995, the petitioners sued the respondents, the New Hampshire Department of Revenue Administration and its commissioner, claiming that the tax exemptions favored New Hampshire banks and thereby violated Part I, Article 12 and Part II, Articles 5 and 6 of the State Constitution and the Commerce and Equal Protection Clauses of the Federal Constitution. The petitioners sought a full refund of all I&D taxes paid from 1991 through 1994. The Superior Court (*Manias*, J.) transferred without ruling several constitutional questions for our review, excluding any issues on remedy. We answered two of these questions in *Smith I*.

In *Smith I*, 141 N.H. at 688, we upheld the validity of the tax exemptions under the State Constitution. We held, however, that the legislature's "protectionist effort" in favor of domestic banks violated the Commerce Clause of the United States Constitution. *Id.* at 688, 695-96. Having determined that the exemptions discriminated on their face against out-of-state banks and, therefore, violated the Commerce Clause, we remanded for a determination as to whether the exemptions, in

practice, also discriminated against out-of-state non-bank investment sources. *See id.* at 696.

Following a six-day merits hearing, the trial court determined that the petitioners failed to show that the exemptions, in practice, discriminated against out-of-state non-bank investment sources. Accordingly, the court ruled that they were entitled to only a partial refund of their I&D taxes, representing the I&D taxes they had paid on out-of-state bank investments. The court ruled that the petitioners were not entitled to a remedy regarding the I&D taxes paid on investment income from out-of-state non-bank sources. The petitioners appealed.

## II. The Dormant Commerce Clause

In *Smith I*, we outlined a comprehensive framework of Commerce Clause jurisprudence, and need not repeat ourselves here. We do, however, revisit a few fundamental principles.

██ The Commerce Clause grants Congress the authority to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. This power includes a negative aspect, known as the dormant Commerce Clause, which prohibits States from unjustifiably discriminating against or burdening the interstate flow of articles of commerce. *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 98 (1994). The core purpose of the dormant Commerce Clause is to prohibit economic protectionism—"that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273-74 (1988). As related to state taxation, the dormant Commerce Clause precludes States from "impos[ing] a tax which discriminates against interstate commerce by providing a direct commercial advantage to local business." *Bacchus Imports, LTD v. Dias*, 468 U.S. 263, 268 (1984) (quotations and ellipsis omitted).

The Supreme Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. *Brown-Forman Distillers v. N.Y. Liquor Auth.*, 476 U.S. 573, 578-79 (1986). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [the Supreme Court has] generally struck down the statute without further inquiry." *Id.* at 579. Such a statute is "virtually *per se* invalid." *Oregon Waste Systems, Inc.*, 511 U.S. at 99.

When, however, a statute only indirectly affects interstate commerce and regulates evenhandedly, the Supreme Court has "examined whether

the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers*, 476 U.S. at 579; *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Nondiscriminatory state regulations having only incidental effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

"In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman Distillers*, 476 U.S. at 579.

In *Smith I*, 141 N.H. at 695, the respondents conceded, and we held that the exemptions at issue facially discriminated against out-of-state banks. The respondents also conceded that the discrimination did not advance a legitimate local purpose. *Id.* at 694. In light of these concessions, we remanded the question of whether the exemptions *also* discriminated against non-bank investment sources in their practical effect, thus entitling the petitioners to a full refund of the I&D taxes they paid on all out-of-state investments during the relevant years. *Id.* at 696-97.

## III. Analysis

### A. Standard of Review

On appeal, "[w]e will affirm the trial court's factual findings unless they are unsupported by the evidence, and will affirm the trial court's legal rulings unless they are erroneous as a matter of law." *Morgenstern v. Town of Rye*, 147 N.H. 558, 561 (2002) (citation omitted).

As an initial matter, we reject the petitioners' assertion that we must review the trial court's factual findings *de novo* because this appeal involves constitutional issues. "[N]o broader review is authorized here simply because this is a constitutional case, or because the factual findings at issue may determine the outcome of the case." *Maine v. Taylor*, 477 U.S. 131, 145 (1986); *see Morgenstern*, 147 N.H. at 561 (employing deferential review of trial court's findings in context of constitutional challenge). The empirical component of assessing the validity of a constitutional claim, like any other form of fact-finding, is the basic responsibility of the trial courts. *Maine*, 477 U.S. at 144-45. Our task on appeal "is not to decide whether we would have found differently but to determine whether a reasonable person could find as did the trial judge." *Averill v. Dreher-Holloway*, 134 N.H. 469, 472 (1991) (quotations omitted); *accord Maine*, 477 U.S. at 145.

*B. Smith I*

The petitioners first urge us to reconsider *Smith I*. They invite us to conclude, as a matter of law, that the tax exemptions at issue facially discriminated against all out-of-state investment sources, not just out-of-state banks. Even assuming that it would be procedurally appropriate for us to revisit *Smith I* in this appeal, we decline the petitioners' invitation to do so.

The petitioners particularly object to our remand instructions in *Smith I*, which required the trial court to "make a factual determination whether New Hampshire bank interest and dividends compete with other sources of investment income such as stock dividends and bond interest." *Smith I*, 141 N.H. at 696. They argue that the Commerce Clause does not require an analysis of whether the entities at issue compete against one another.

We take this opportunity to clarify why it was necessary for the trial court to analyze whether out-of-state non-bank investment sources and in-state banks compete in the same market in order to determine whether the exemptions discriminated against out-of-state non-bank investment sources.

■ "[A]ny notion of discrimination assumes a comparison of substantially similar entities." *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). Entities are "substantially similar" or "similarly situated" for Commerce Clause purposes when they compete against one another in the same market. *See id.* at 299. In this case, the entities at issue, in-state banks and out-of-state non-bank investment sources, have different investment products. *See Smith I*, 141 N.H. at 690. As we explained in *Smith I*, "[b]anks are different." *Id.* at 689. They have "distinct characteristic powers, privileges, and responsibilities." *Id.* "Just as banks differ from other business institutions, bank deposits differ from other investments. Stock in a local 'stock bank' is a different sort of stock." *Id.* at 690.

■ "[W]hen the allegedly competing entities provide different products, as here, there is a threshold question whether the [entities] are indeed similarly situated for constitutional purposes." *General Motors Corp.*, 519 U.S. at 299. "This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.* Thus, unless the entities compete against one another in a single market, "there can be no local preference, whether by express

discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id.* at 300.

We find the petitioners' attempt to distinguish *General Motors Corp.* unpersuasive. The petitioners argue that *General Motors Corp.* applies only to regulated markets, such as the market for natural gas. The Supreme Court did not limit its holding to regulated markets, however. Moreover, the idea that discrimination under the Commerce Clause must involve entities that compete against one another is not a new one. *See Alaska v. Arctic Maid*, 366 U.S. 199, 204-05 (1961) (holding that claimants and cold storage facilities served separate markets, did not compete with one another, and thus were not similarly situated for Commerce Clause purposes); *Bacchus Imports, LTD.*, 468 U.S. at 271 ("as long as there is some competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect"); *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 197 (1995) ("States are barred from discriminating against foreign enterprises competing with local businesses.").

The petitioners assert that because the Supreme Court did not analyze whether there was competition between domestic and foreign interests in a number of cases, no such analysis is required "in an unregulated markets case." We disagree.

In the cases upon which the petitioners rely, no competition analysis was required because the statutes at issue differentiated between obviously similarly situated entities. *See South Central Bell Telephone Co. v. Alabama*, 526 U.S. 160, 169-70 (1999) (franchise tax gave domestic corporations ability to reduce tax liability by reducing par value of stock, while denying foreign corporations the same ability); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 328 (1996) (stock in corporation doing all of its business in-state entitled to 100% taxable percentage deduction, while stock in corporation doing all of its business out-of-state not entitled to any deduction); *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 330-32 (1977) (security transactions involving out-of-state sales taxed more heavily than those involving in-state sales).

### C. Trial Court's Legal Rulings and Factual Findings

The petitioners next assert that the trial court employed an erroneous legal standard to determine whether out-of-state non-bank investment sources competed with in-state banks. We disagree.

Consistent with Supreme Court precedent and with the remand instructions in *Smith I*, the trial court first noted that the exemptions at

issue discriminated on their face against out-of-state banks only. "By their very terms, the statutory exemptions at issue in this case economically protected New Hampshire banks. New Hampshire banks were advantaged to the disadvantage of out-of-state banks. The exemptions encouraged investment in New Hampshire banks by providing an economic benefit to investors in in-state banks which investors in out-of-state banks did not receive."

The court then examined whether other investment products, not subject to the facial discrimination, were discriminated against. Pursuant to *General Motors Corp.*, the court examined whether products from out-of-state non-banks were similarly situated to products from New Hampshire banks, in that they competed against one another in the same market. We find no legal error in this standard.

The petitioners assert that the trial court, in effect, accepted the respondents' defense that the tax was so small that its effect on the marketplace was *de minimis*, and could not have constituted a constitutional violation. We do not share the petitioners' interpretation of the trial court's ruling. Nor do we agree with the petitioners that the trial court required them to quantify the extent of the alleged discrimination between the investment products of out-of-state non-banks and of New Hampshire banks.

We similarly reject the petitioners' argument that the legal standard the trial court employed is "ill-advised" because it requires "complex economics and market analysis in every Commerce Clause case." We do not speak to every Commerce Clause case, but conclude that, in this case, the petitioners' burden was not unduly difficult.

The petitioners needed to convince the trial court, by a preponderance of the evidence, that, absent the exemptions, local bank products and out-of-state non-bank products would have served the same market of investors. In other words, the petitioners had to demonstrate that the exemptions caused investment in local bank products that otherwise would have occurred in non-bank products.

Because the I&D tax exemptions had been repealed for approximately five years by the time the merits hearing occurred, the petitioners had a unique evidentiary opportunity. Unlike other cases in which a party can rely only upon the mere theoretical possibility that, absent the allegedly impermissible statute, entities producing different products would have competed in the same market, the petitioners could have shown how the repeal of the exemptions *actually* affected the investor marketplace. They had the benefit of several years' passage of time without the exemptions to

compare marketplace interplay among local bank products and out-of-state non-bank products.

For example, the petitioners could have collected empirical evidence, both before and after the repeal, to show that investors tended to invest more in New Hampshire bank products before 1995, and, after 1995, shifted assets to non-bank products or invested equally in both since bank products no longer enjoyed the tax exemptions. Alternatively, they could have examined whether local banks readjusted their products after the repeal in an attempt to maintain the alleged competitive advantage over non-bank products and retain more investor dollars.

Instead of relying upon this kind of empirical analysis, the petitioners advanced a broad economic theory that the financial marketplace is global such that *every* financial investment competes with *every* other financial investment for *every* available investment dollar. As fact-finder, the trial court was free to reject this theory, however, and we find no legal error in its doing so. *See Tennessee Gas Pipeline Co. v. Town of Hudson*, 145 N.H. 598, 602 (2000) (trial court may accept or reject such portions of evidence presented, including that presented by expert witnesses).

The petitioners' expert, Professor Dennis Logue of the Tuck School of Business at Dartmouth College, testified that under modern portfolio theory, investments and financial vehicles share four characteristics: risk, return, convenience and liquidity. Consumers choose among products based upon the relative level of each of these characteristics. Because every financial investment has these four characteristics to different degrees, Professor Logue concluded that New Hampshire bank investment products necessarily compete with "virtually every other financial asset in the world in some way or another."

Professor Logue also predicted that, because of the exemptions, "New Hampshire investors would choose to hold a larger fraction of their financial wealth as deposits or instruments in New Hampshire banks than they would have absent the tax-advantaged status of those investments. That is to say, the effect of the tax exemption was to cause New Hampshire residents to hold fewer out-of-state securities than they might otherwise have held."

The respondents' evidence directly contradicted the petitioners' evidence. For instance, Marc Hebert, a certified financial planner, testified that although all financial vehicles share characteristics of risk, return, convenience and liquidity, the relative characteristics of such instruments may differ so significantly as to place them in different—and essentially non-competitive—"asset classes."

Dr. Margaret Guerin-Calvert, a consulting economist and principal of Economist, Incorporated, an economic consulting firm, testified that to measure competition among products or services, one must analyze either the extent to which price or other marketing changes to one product causes the producers of potentially alternative products to react competitively or the extent to which consumers of products treat other products as "substitutable" or "reasonably interchangeable."

After analyzing bank investment products and non-bank investment products, Dr. Guerin-Calvert concluded that, contrary to the petitioners' theory, all bank deposit products do not compete in a national market with all other financial instruments. She testified that, in the view of the Federal Reserve Board, for instance, banks offer unique services and products that are competitive only with the services and products offered by other banks. "[T]he only products to which consumers could and would turn in the event of a price increase of this set of products, would be similar products or sets of products produced by other banks." She also testified that the Federal Reserve Board defines the geographic scope of the markets in which banks compete with one another as local, not national.

Dr. Guerin-Calvert offered alternative explanations for some of the investment patterns the petitioners' expert had discovered. For instance, Professor Logue concluded that because consumers often have both low risk/low return assets, such as bank certificate of deposit accounts, and higher risk/higher return equities, such as common stock, and often transfer money between these two types of assets, these assets are substitutable for one another.

By contrast, Dr. Guerin-Calvert hypothesized that "[t]he fact that shifting funds out of a higher risk item and into a lower risk item reduces the overall or composite risk of a portfolio does not demonstrate that the two products are substitutes for each other. It does not demonstrate that small, but significant changes in the price of one are likely to result in large increases in the quantity purchased of the other. It could instead be reflective of consumers' interest in having a diversified set of items to meet a variety of needs."

Dr. Guerin-Calvert also conducted a regression analysis to see whether the investment behavior of consumers changed after the exemptions were repealed. She observed that "there was no substantial decline in [bank] deposit holdings in many deposit categories in New Hampshire banks" after the exemptions were repealed. She opined that the repeal, in fact, did not change investor behavior.

After weighing the conflicting evidence, the trial court concluded that the global financial marketplace the petitioners posited is actually comprised of a number of smaller sub-markets in which similarly situated institutions with substantially similar products compete against one another.

Relying, in part, upon our conclusion in *Smith I*, 141 N.H. at 689-90, that banks and bank stock are "different," the court ruled that the petitioners' economic theory failed to establish that out-of-state non-bank investment sources and New Hampshire banks competed with one another in the same market. The court observed that the petitioners had not proved that "investor decisions between non-bank sources of income and bank sources are ever governed by anything other than tax-neutral criteria." Further, the court noted that the petitioners did not "produce any evidence tending to show that any investor ever chose a New Hampshire bank product instead of an out-of-state non-bank investment because of the . . . tax exemptions." Nor was there any evidence that out-of-state non-bank investment sources "either saw themselves as competing in the same market with New Hampshire banks or acted as if they were." Absent this evidence, the court concluded that the petitioners had failed to show that the exemptions discriminated against out-of-state non-bank investment sources.

The trial court found, in particular, that "[p]rivate debt or equity instruments are not substitutable for and do not compete with bank depository products in a defined market." The petitioners challenge this finding as not supported by the evidence. We disagree. This finding is amply supported by Dr. Guerin-Calvert's testimony.

For instance, before opining that bank products and services compete only in a market with the products and services offered by other banks, Dr. Guerin-Calvert explained the differences between equity instruments and bank depository instruments, including their different functions. For example, she testified that while consumers can readily obtain access to cash from bank depository products, they cannot do so for equity instruments such as stock. Moreover, unlike other instruments, bank depository products are federally insured. Further, investors use bank depository products for different purposes than other instruments.

The petitioners also challenge the trial court's finding that "[b]ecause local bank stock is privately held and rarely traded it is not substitutable for publicly-traded stock." This finding is also supported by the evidence.

Numerous witnesses testified that the stock in many New Hampshire banks was not publicly traded. Unlike stock traded on a national exchange, acquiring bank stock generally requires going through an auction process

when the stock becomes available for sale. Witnesses also testified that, for a number of reasons, New Hampshire bank stock was neither as liquid as nor as marketable as non-bank stock.

█ Because we conclude that the evidentiary record fully supports the trial court's factual findings, we uphold its determination that investment products from out-of-state non-banks do not compete in the same market with investment products from New Hampshire banks. *See Morgenstern*, 147 N.H. at 561.

We disagree with the petitioners' assertion that whether the products of these entities compete in the same market is a legal question entitled to *de novo* review. This is a factual question entitled to deference. Moreover, because we hold that the trial court used the correct legal standard to determine whether the exemptions discriminated against out-of-state non-bank investment sources, there is no need to weigh the evidence against a different legal standard. Even were we to agree that the trial court used an incorrect legal standard, ordinarily we would not reweigh the evidence, but would remand to the trial court to do so. *See Simplex Technologies v. Town of Newington*, 145 N.H. 727, 732 (2001).

The petitioners' remaining arguments lack merit and warrant no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

NADEAU and DUGGAN, JJ., concurred.