## SOUTHCENTRAL PENNSYLVANIA WASTE HAULERS ASSOCIATION, et al., Plaintiffs,

v.

## BEDFORD–FULTON–HUNTINGDON SOLID WASTE AUTHORITY, et al., Defendants.

Civ. A. No. 1:CV–93–1318.

United States District Court, M.D. Pennsylvania.

June 24, 1994.

As Amended June 28, 1994.

Bernard A. Labuskes, Jr., Scott A. Gould, Harrisburg, PA, for Southcentral Pennsylvania Waste Haulers Ass'n, Howell Trucking Inc., Queen City Leasing, Inc., Park's Garbage Service, Inc., Samuel E. Slates, A.L. Douglas, Valena Carper, Stanton Querry, Worthy's Refuse Service, Fred Bousom, Charlotte Snyder, T. Ray Peck.

Charles A. Bierbach, Huntingdon, PA, Paul Stephan Kline, Robert B. Hoffman, Franklin L. Kury, Reed Smith Shaw & McClay, Harrisburg, PA, for Bedford–Fulton–Huntingdon Solid Waste Authority, Bedford County.

Susan E. Schwab, Charles E. Gutshall, Kenneth L. Joel, Rhoads & Sinon, Harrisburg, PA, for Fulton County, Huntingdon County.

Carl B. Schultz, Central Legal Litigation, Melanie G. Cook, PA Dept. Environmental Resources, Central Region Litigation, Harrisburg, PA, for Com. of Pennsylvania, Dept. of Environmental Resources.

## MEMORANDUM

RAMBO, Chief Judge.

This case presents a challenge to the "flow control" component of the waste management plan adopted by Defendants in this case. Plaintiffs argue that the restrictions violate the "dormant" or "negative" Commerce Clause of the United States Constitution. The case is before the court on several parties' motions for summary judgment which have been briefed[1] and are ripe for disposition.

### Background

The following essential facts are not in dispute. In response to a rapid decrease in the 1980's in the number of operating landfills and available landfill space in Pennsylvania, the Commonwealth of Pennsylvania enacted the Municipal Waste Planning, Recycling and Waste Reduction Act ("Act 101"), 53 P.S. § 4000.101 *et seq.* Act 101 was intended to ensure adequate long-term capacity for the disposal of waste generated within the Commonwealth. 53 P.S. § 4000.102(a). The Act gave counties the primary responsibility for the development and implementation of long-range plans for the disposal of waste generated within their borders. *Id.* Counties were required to plan over a ten year horizon.

To meet their responsibilities under Act 101, Bedford, Fulton and Huntingdon Counties (hereafter, the "Counties") jointly developed the Bedford Fulton Huntingdon Municipal Waste Management Plan (the "Plan").

---

1. The court permitted the parties to submit supplemental briefs addressing the applicability of a recent Supreme Court case. Further, Defendants Fulton and Huntingdon Counties have requested leave to file a sur-reply brief with respect to Plaintiffs' motion for summary judgment. The court will grant the motion to permit Defendants to respond to arguments regarding their defenses of laches and failure to exhaust administrative remedies and because Plaintiffs filed no brief in opposition to the motion. The joint motion of the Pennsylvania Department of Environmental Resources ("DER") and Fulton and Huntingdon Counties to amend their answers also will be granted as unopposed.

(Pls.' Sum.Jt.Mot., Ex. A.) The Plan was adopted after a lengthy process which included substantial study of various disposal alternatives and public notice and hearings. The initial version of the Plan was completed in 1989 and the revised Plan, in 1991. By resolution, each county separately has adopted the Plan. (*See id.,* Exs. B–D (collectively, the "Resolutions").

The Plan and the various county ordinances and resolutions empower a municipal corporation, the Bedford–Fulton–Huntingdon Solid Waste Management Authority (the "Authority"), to implement the Plan. (*See* Pls.' Supp.Br., Ex. A at 12–13, Exs. B–D, F–H.) In accordance with the Plan, the Authority has undertaken the financing and construction of a landfill located in Bedford County (the "Authority landfill"). The design, land acquisition and construction costs of the landfill were financed by Farmers Home Administration ("FmHA") bonds in the amount of $7.03 million. Although the Authority is the primary obligor under the bonds, FmHA required the Counties each to guarantee a proportionate share of the bonds.

Pursuant to the authority conferred upon it by the Plan and the Resolutions and Ordinances, the Authority has promulgated a set of rules and regulations (hereafter "Authority Rules"). (*Id.,* Ex. E.) The Authority Rules mandate that all "Regulated Municipal Waste" generated or collected within the participating counties be disposed of at Authority facilities. (*Id.* at 6, 9.) Subject to minor exceptions, this requires that all municipal waste generated or collected within the three counties be brought to the Authority landfill in Bedford County. (Pls.' Statement of Undisputed Facts, ¶¶ 11–12; Defs.' Resp., ¶¶ 11–12.) Permission from the Authority is required to transport Regulated Municipal Waste across state or county lines; such permission generally is granted only in conjunction with a waste transfer agreement with another county. (*Id.,* ¶ 12.) Under the Authority Rules, a hauler who takes trash out of the Counties for disposal without per-

mission is subject to substantial sanctions, including loss of its trash hauling license. (*Id.,* ¶ 13.) Each county has passed an ordinance providing that all municipal waste generated within the county must be delivered to the facilities designated by the Authority pursuant to the Plan. (*Id.,* Exs. F–H (collectively, the "Ordinances").)

The Authority Rules and the Ordinances in combination form the flow control policies to which Plaintiffs in this case object.[2] Plaintiffs object to being forced to take trash to the Authority landfill because its tipping fees are substantially higher than the fees at other in-state and out-of-state facilities. For example, Plaintiffs assert that while tipping fees at the Authority landfill are $58 per ton (soon to rise to $61.80 per ton), those at a landfill in neighboring Somerset County, Pennsylvania are $28 per ton. Plaintiffs allege that, absent Defendants' flow control mandate, they would haul trash to less expensive facilities in Pennsylvania and Maryland. They claim that the flow control policy is economic protectionism. Accordingly, they challenge the Plan "to the extent that it operates to insulate the Authority's own landfill from all competition by directing that all county waste be delivered exclusively to that facility." (Pls.' Supp.Br. at 5.)

## Discussion

The Third Circuit Court of Appeals has capsulized the standards for the award of summary judgment under Federal Rule of Civil Procedure 56:

> Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, [247,] 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial*

---

**2.** Hereafter, where applicable, reference to the Authority Rules includes the Ordinances which authorize the Authority's rulemaking power.

*Serv. Corp.,* 812 F.2d 141, 144 (3d Cir. 1987). If evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson,* [477 U.S. at 249,] 106 S.Ct. at 2511; *Equimark,* 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, [586,] 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987).

Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party may not simply sit back and rest on the allegations in his complaint, but instead must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (*quotations omitted* ).

## I. Plaintiffs' Motion for Summary Judgment

Plaintiffs argue that Defendants' flow control policy violates the dormant Commerce Clause of the United States Constitution. The Commerce Clause provides that "Congress shall have the power ... to regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause has a "negative" or "dormant" aspect which "has long been understood to ... den[y] the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Environmental Quality of Oregon,* 511 U.S. ——, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994) (citing *Wyoming v. Oklahoma,* 502 U.S. 437, 453, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992); *Welton v. Missouri,* 91 U.S. 275, 23 L.Ed. 347 (1876)).

The Court recently discussed the purpose of the Commerce Clause:

The Framers granted Congress plenary authority over interstate commerce in "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma,* 441 U.S. 322, 325–26[, 99 S.Ct. 1727, 1730–31, 60 L.Ed.2d 250] (1979). *See generally* The Federalist No. 42 (J. Madison). "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, ... has as its corollary that the states are not separable economic units." *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 537–38[, 69 S.Ct. 657, 664–65, 93 L.Ed. 865] (1949).

*Oregon Waste,* 511 U.S. at ——–——, 114 S.Ct. at 1349–50.

The processing and disposal of waste may be the most popular subject of Commerce Clause analysis in recent years. In the last three terms, the United States Supreme Court has addressed four Commerce Clause challenges to regulations involving trash. *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Oregon Waste Sys., Inc. v. Department of Environmental Quality of Oregon,* 511 U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *see also Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). In recent years, numerous lower courts also have addressed Commerce Clause challenges to various waste management schemes. *See, e.g., Waste Systems Corp. v. County of Martin,* 985 F.2d 1381, 1387 (8th Cir.1993); *J. Filiberto Sanitation Corp. v. New Jersey Dep't of Envtl. Protection,* 857 F.2d 913 (3d Cir. 1988); *Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Authority,* 814 F.Supp. 1566, 1578 (M.D.Ala.1993).

Commerce Clause case law "yields two lines of analysis: first, whether the ordinance

discriminates against interstate commerce, *Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535; and second, whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to putative local benefits.' *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142[, 90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970)." *Carbone*, 511 U.S. at ——, 114 S.Ct. at 1682. If the ordinance is discriminatory, it is "per se invalid save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* at ——, 114 S.Ct. at 1683. In contrast, the *Pike* test is "softer around the edges," *id.* at —— – ——, 114 S.Ct. at 1698–99 (Souter, J., dissenting), leaving the burden of proof with the party challenging the statute.

In this case, Plaintiffs assert that Defendants' flow control policy is discriminatory on its face and in effect and that the burden should shift to Defendants to show that the flow control ordinances are the only available means for advancing a legitimate state interest. Defendants, on the other hand, assert that the ordinances have neither a discriminatory purpose nor effect and should be analyzed under the *Pike* test.

Recently, the Supreme Court faced a challenge to a flow control ordinance very similar to the one at issue here. *Carbone*, 511 U.S. at —— – ——, 114 S.Ct. at 1680–81. While the Town of Clarkstown ordinance addressed by the Supreme Court did not prohibit the ultimate export of waste (as do the challenged ordinances in this case), it mandated that all qualified waste generated within Clarkstown be brought for processing to the single transfer facility designated by the town. *See* Clarkstown ordinance, 511 U.S. at —— – ——, 114 S.Ct. at 1684–87. Only after the designated facility had processed the waste and extracted a fee from the hauler could the waste be taken out of the municipality. *Id.*

The *Carbone* court analyzed the Commerce Clause challenge in three parts, addressing the following three questions:

(1) Does the ordinance regulate interstate commerce?

(2) If so, does the ordinance regulate evenhandedly with only "incidental" effects on interstate commerce or does it discriminate against interstate commerce?

(3) If discriminatory, is the ordinance the only available means to advance a legitimate state interest?

*Id.* at —— – ——, 114 S.Ct. at 1681–84. Concluding that the ordinance regulated and discriminated against interstate commerce and that it was not the only available means for addressing the legitimate interests of the municipality, the Court struck down the Clarkstown flow control ordinance. *Id.* This court will follow the mode of analysis employed in *Carbone*.

### A. The Authority Rules Regulate Interstate Commerce

 Trash, or at least the service of processing and disposing of it, indisputably is an article of commerce. *Carbone*, 511 U.S. at ——, 114 S.Ct. at 1682 ("the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it"); *Fort Gratiot*, 504 U.S. at 357, 112 S.Ct. at 2022 ("Solid waste, even if it has no value, is an article of commerce."); *Chemical Waste Management*, 504 U.S. at 340 n. 3, 112 S.Ct. at 2013 n. 3 (same); *Philadelphia*, 437 U.S. at 622–23, 98 S.Ct. at 2534–35 (same). The ordinances at issue in this case clearly regulate both solid waste and the services of hauling and disposing of it.

The Authority and Bedford County argue that the Commerce Clause is not applicable in this case because, at the time the Plan was developed and adopted, there was no out-of-state seller willing to sell the long-term disposal capacity that the Counties were seeking. Defendants have cited nary a case in support of their argument that this fact makes the Commerce Clause wholly irrelevant. That is not surprising. The Supreme Court has made clear that the mere fact that the effects of a state or local law "are interstate in reach" is sufficient to bring an ordinance within the ambit of the Commerce Clause. *Carbone*, 511 U.S. at ——, 114 S.Ct. at 1681.

In *Carbone*, the Supreme Court rejected the municipality's effort to hold a local re-

source, trash and the service of disposing of it, out of the stream of interstate commerce. Clarkstown had argued that its ordinance was merely a quarantine which "prevents garbage from entering the stream of commerce until it is made safe." *Id.; see also* Clarkstown Supreme Ct. Br., 1993 WL 433043 at *16 ("the Ordinance intervenes before locally discarded garbage enters commerce"). The Court found that this argument was "premised [ ] on an outdated and mistaken concept of what constitutes interstate commerce." *Id.* Focusing on the effects of the ordinance, the Court noted that "the flow control ordinance drives up the cost for out-of-state interests to dispose of their solid waste." *Id.*

More important for purposes of this case, the Court noted that

> even as to waste originant in Clarkstown, the ordinance prevents everyone except the favored local operator from performing the initial processing step. The ordinance thus deprives out-of-state businesses of access to a local market. These economic effects are more than enough to bring the Clarkstown ordinance within the purview of the Commerce Clause. It is well-settled that actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its flow.

*Id.*

In this case, the Authority Rules patently classify waste based on its origin. Waste generated within the Counties must be disposed of within the Counties, diverting the waste and associated tipping fees from the stream of interstate commerce. *See Waste Sys. Corp. v. County of Martin,* 985 F.2d 1381, 1387 (8th Cir.1993) (tipping fees received by county landfill pursuant to flow control ordinance constituted diversion of revenue from interstate commerce). Further, the Authority Rules are similar to the challenged ordinance in *Carbone* in that they prevent everyone except the "favored local operator", the Authority, from disposing of trash generated within the Counties. Out-of-

state landfills are not permitted to compete to provide these disposal services. These economic effects "are more than enough to bring the [Rules and ordinances] within the purview of the Commerce Clause." *Carbone,* 511 U.S. at ——, 114 S.Ct. at 1681.

Case law makes clear that any argument that the Authority Rules only purport to regulate intrastate commerce is untenable.

> That the ordinances purport only to prevent the flow of waste across county instate borders does not change the effect that Ordinances have on interstate commerce. As the Supreme Court recently reaffirmed, a county 'may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than the State itself.'

*Waste Systems,* 985 F.2d at 1386 (quoting *Fort Gratiot,* 504 U.S. at 360, 112 S.Ct. at 2024). Accordingly, Defendants' argument that the Commerce Clause is inapplicable must be rejected.[3]

### B. The Ordinances Discriminate Against Interstate Commerce

■ In analyzing an ordinance subject to judicial scrutiny under the negative Commerce Clause, the Court must "determine whether [the ordinance] 'regulates evenhandedly with only incidental effects on interstate commerce,' or discriminates against interstate commerce." *Oregon Waste,* 511 U.S. at ——, 114 S.Ct. at 1350.

Defendants' argument that the ordinances are not discriminatory focuses on the Plan as a whole. From Defendants' perspective, the flow control ordinance cannot be analyzed by itself, but must be viewed in context, as merely one component of a comprehensive, evenhanded regulatory plan designed to address the region's waste disposal needs. Thus, Defendants claim that the ordinances were not enacted for a discriminatory purpose. Plaintiffs, on the other hand, argue that they are not challenging the Plan as a whole but only that portion of it which bur-

---

**3.** While not dispositive of whether the Authority Rules implicate the Commerce Clause, the substance of Defendants' argument—that they could not get the precise service they were seeking on

the open market—may be relevant to whether the ordinances were the only available means for achieving legitimate local governmental interests. *See* discussion, *infra.*

dens interstate commerce—namely, the flow control Ordinances and Rules.

This court believes that Plaintiffs' approach is proper. An ordinance may be discriminatory either on its face or in effect, *Wyoming v. Oklahoma,* 502 U.S. 437, 453, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992), and "[t]he evil of protectionism can reside in legislative means as well as legislative ends." *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 340, 112 S.Ct. 2009, 2013, 119 L.Ed.2d 121 (1992) (quoting *Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2536; *Fort Gratiot,* 504 U.S. at 360, 112 S.Ct. at 2024). In cases where "a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy," the offending law or ordinance routinely has been struck down. *Id.* (quoting *Philadelphia,* 437 U.S. at 627, 98 S.Ct. at 2537).

In this case, the Counties' purposes in adopting the Plan undoubtedly were legitimate. Localities have an historic and important interest in the proper disposal of waste. *Carbone,* 511 U.S. at ——, 114 S.Ct. at 1690 (O'Connor, J. concurring). However, the flow control policy, the means adopted to achieve these legitimate goals discriminates on its face on the basis of the origin of the waste. Waste generated within the Counties must be disposed of there; waste generated elsewhere need not. Further, the plain effect of the flow control policy is to hoard an article of interstate commerce, either trash or the service of disposing of it, for the benefit of local citizens and at the expense of out-of-state interests in the interstate market.

In addition, in claiming that the flow control policy was necessary to secure financing to carry out the Plan, Defendants are conceding that the purpose of the flow control Ordinances and Authority Rules themselves was to finance the Authority landfill. The Ordinances themselves indicate as much. *See* Ordinances, at 2 ("to guarantee the long-

term economic viability of the Solid Waste System"; "to ensure that the facilities ... can be financed"; "to moderate the cost of such facilities over the long-term"). There is no evidence, apart from its alleged necessity to finance the Authority landfill, that the flow control component of the Plan was necessary to ensure a health and safety or other local interest.[4] While a state "has every right to protect its residents' pocketbooks as well as their environment," it may not do so at the expense of or by discriminating against interstate commerce. *Philadelphia,* 437 U.S. at 626–27, 98 S.Ct. at 2536–37.

The challenged Ordinances and Authority Rules are nearly on all fours with the ordinance struck down by the Supreme Court in *Carbone.* As noted above, the Clarkstown ordinance mandated that all trash originating in Clarkstown be processed at a single facility designated by the town. In finding the ordinance discriminatory, the Court stated that

> The essential vice in laws of this sort is that they bar the import of the processing service. Out-of-state meat inspectors, or shrimp hullers, or milk pasteurizers, are deprived of access to local demand for their services. Put another way, the offending local laws hoard a local resource—be it meat, shrimp, or milk—for the benefit of local businesses that treat it.

511 U.S. at ——, 114 S.Ct. at 1683. The Court found that the Clarkstown ordinance impermissibly "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.* The fact that the ordinance favored only one local facility does not cure the defect, but rather "just makes the protectionist effect of the ordinance more acute.... The flow control ordinance at issue here squelches competition in the waste-processing service altogether, leaving no room for investment from outside." *Id.*

The Ordinances and Authority Rules share the same vice as that in Clarkstown—they

---

4. To the extent that the Counties were concerned about health and safety, it is unlikely that flow control, as opposed to regulation, would be the least burdensome way (in terms of interstate commerce) to achieve this interest. *See Carbone,*

511 U.S. at ——, 114 S.Ct. at 1683 (the most obvious nondiscriminatory alternative to flow control to address health and safety concerns would be uniform safety regulations).

favor the single Authority facility over all others, hoarding locally generated waste, squelching competition and leaving no room for outside investment. The limited exception permitting waste to be taken across state or county lines or to a facility other than the Authority landfill does not qualify the discriminatory character of the Authority rules. The County concedes that such permission "is typically available only in conjunction with a waste transfer agreement with another county." (F–H Resp. to Pls.' Facts, ¶ 12.) In any event, the exception "merely reduce[s] the scope of the discrimination; for all categories of waste not excepted by the regulations, the discriminatory ban remain[s] in place." *Fort Gratiot,* 504 U.S. at 360, 112 S.Ct. at 2025.

Defendants seek to distinguish *Carbone* on several grounds. First, they argue that the facility in Clarkstown was privately-owned, as opposed to the publicly-owned Authority facility at issue in this case. However, as the dissent clearly pointed out, the Clarkstown facility at issue in *Carbone* was essentially an agent of the municipality. 511 U.S. at ——, 114 S.Ct. at 1695. It was built and operated pursuant to a contract with the municipality, performed a traditional municipal function and was soon to revert to municipal ownership. *Id.* The ordinance on its face referred to the transfer station as "the Town of Clarkstown solid waste facility." *Id.,* App. § 2.A.1. These facts did not persuade the majority that the regime was non-discriminatory or that the less stringent *Pike* analysis should apply.

Further, several other courts examining flow control ordinances which directed trash to public, municipally-owned facilities have applied the more stringent test for cases of overt discrimination and found that the ordinances violated the dormant Commerce Clause. *See, e.g., Waste Sys. Corp. v. County of Martin,* 985 F.2d 1381, 1387 (8th Cir. 1993) (flow control ordinance directing all waste generated within county to county landfill discriminated against interstate commerce, "protect[ing] in-state economic interests at the expense of out-of-state competitors"); *Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Auth.,* 814

F.Supp. 1566, 1578 (M.D.Ala.1993) (same). Accordingly, this court is not persuaded that the public nature of the Authority facility changes the applicable analysis.

Defendants also argue that *Carbone* should be narrowly construed and limited to the facts of the case. They claim that the Supreme Court struck down the Clarkstown ordinance only because Clarkstown identified no other purpose for the measure than to finance the local facility and because the facility ousted an existing competitor and was unnecessary in light of the availability of pre-existing processing services at the competitor's facility. On closer review, Defendants' characterization of *Carbone* does not wash.

First, a consent decree arising out of litigation brought against Clarkstown by the New York Department of Environmental Conservation required the town to build the transfer station at issue in that case. This goes a long way toward rebutting the implication that the station was either unnecessary or built solely to oust a local competitor. Second, the challenged ordinance itself stated that it was "intended to benefit the health, welfare and safety of Town residents" and was an exercise of "essential and proper governmental functions." *Carbone,* 511 U.S. at ——, 114 S.Ct. at 1685, App., §§ I, II. Clarkstown also alleged that its flow control ordinance was "part of its overall plan for handling and monitoring all Clarkstown waste." (Clarkstown Supreme Ct.Br., 1993 WL 433043 at *8.) The Court looked beyond these asserted purposes and, focusing specifically on the policy alleged to be discriminatory, found that in essence the only real purpose for the flow control ordinance itself was to finance the Clarkstown facility. The same rationale applies here. Accordingly, the court is not persuaded that *Carbone* should be construed as narrowly as Defendants may wish.

Finally, Defendants allege that this case is governed by the decision of the Third Circuit in *J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection,* 857 F.2d 913 (3d Cir.1988). In *Filiberto,* a Hunterdon County, New Jersey ordinance required that all waste collected within the county be brought

to a designated facility for processing and disposal. This flow control scheme is nearly identical to the one the United States Supreme Court found unconstitutional in *Carbone*. In *Filiberto,* the Third Circuit found the measure to be non-discriminatory in purpose because it was "triggered by the origin of the waste, and blind to the origin of the hauler." 857 F.2d at 921. The *Filiberto* court found the scheme was not discriminatory in effect because, after processing, the waste ultimately still would be deposited out-of-state. These same factors existed in *Carbone*, but the Supreme Court did not find them dispositive. Instead, the Supreme Court focused on a factor not addressed by the Third Circuit in *Filiberto,* namely, the "essential vice" of the statute, that it "bar[s] the import of the [waste] processing service." *Carbone*, 511 U.S. at ——, 114 S.Ct. at 1683. The *Filiberto* scheme shared that vice. Accordingly, this court is not persuaded that either the rationale or the result [5] in *Filiberto* survive after *Carbone*.[6]

## C. Availability of Alternatives to Flow Control

■ Because the Counties' flow control policy discriminates against interstate commerce, the burden shifts to the Counties to "demonstrate, under rigorous scrutiny, that [they have] no other means to advance [their] legitimate local interest." *Carbone*, 511 U.S. at ——, 114 S.Ct. at 1683. Defendants claim that flow control was the only available means to advance their legitimate interest in securing long-term waste disposal capacity. Because this claim raises a disputed issue of material fact, Plaintiffs' motion for summary judgment must be denied.

Plaintiffs do not dispute that Defendants have a legitimate interest in ensuring sufficient long-term waste disposal capacity for their citizenry. The instant dispute centers on whether less discriminatory means were available to advance this local interest.

Plaintiffs allege in somewhat cursory fashion that there were other alternatives available to the Counties aside from the Plan. However, Defendants recite in detail the efforts they made to secure long-term waste disposal capacity after being informed by the State in 1985 that they would be required to submit a long-term waste disposal plan. Defendants assert that they were unable to secure a reliable long-term disposal contract with any existing in-state or out-of-state landfill within a reasonable distance from the Counties. (Carter Aff., Def.' App., Vol. I, Ex. B, ¶ 19.) Under these circumstances, after significant study, the Counties determined that the best option was to build a tri-county landfill to be owned and operated by the Authority. (*Id.,* ¶ 20.)

Plaintiffs also claim that the Counties could have employed measures other than flow control, including taxes or municipal bonds, to finance the Authority landfill. In opposition, Defendants maintain that the Authority could not obtain financing to build the landfill without the flow control policy. (Finley Aff., Defs.' App., Ex. C., ¶ 16.) By ensuring that a steady stream of trash mass will be deposited at the Authority landfill, flow control ensures the Authority a stable source of revenue in the form of tipping fees. Defendants allege that because the Counties are relatively small and poor, they could not afford to pay up-front the large capital costs of landfill construction. (*Id.,* ¶ 23.) Because the Authority had no real operating history and no significant assets, Defendants assert that flow control was necessary to permit the Authority to sell investment grade bonds and make the project economically feasible. (*Id.,* ¶ 16.)

Thus, there are disputed issues of material fact regarding the waste disposal alternatives available to the Counties and whether flow control was necessary to permit the Authority to build its landfill. These preclude the entry of summary judgment for Plaintiffs.

---

**5.** It is conceivable, though not certain from the record, that the defendants in *Filiberto* would have been able to show the necessity of the flow control ordinance, satisfying the more stringent *per se* test.

**6.** Because it relies on *Filiberto* as binding precedent, the decision of Judge Irenas in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* No. 93–2669 (D.N.J.1993), also is unpersuasive. Notably, *Atlantic Coast* was issued prior to the Supreme Court's recent *Carbone* decision.

## D. Defendants' Other Alleged Defenses

### 1. "Market Participant" Exception

■ Defendants also argue that the Commerce Clause should not apply to this case because they are acting as "market participants." Under the "market participant" doctrine, a state or its subdivision:

that acts as a market participant, rather than as a market regulator 'is not subject to the restraints of the Commerce Clause.' (citing *Swin Resource [Sys., Inc. v. Lycoming County*, 883 F.2d 245, 249 (3d Cir. 1989) ] ) (quoting *White v. Massachusetts Council of Const. Employers*, 460 U.S. 204, 208[, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1] (1983)), [*cert. denied*, 493 U.S. 1077[, 110 S.Ct. 1127, 107 L.Ed.2d 1033] (1990) ]. Put roughly, the market participant exception protects states when they are acting as parties to a commercial transaction, rather than (as, for example, when adopting a tax scheme) [ ] as market regulators. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 437 [, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244] (1980).

*Trojan Technologies, Inc. v. Commonwealth of Pennsylvania*, 916 F.2d 903, 910 (3d Cir. 1990) (parallel citations omitted), *cert. denied*, 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). Thus, when a state enters a market as a buyer (*see White*, 460 U.S. at 208, 103 S.Ct. at 1044; *Trojan*, 916 F.2d at 910) or seller (*see Reeves*, 447 U.S. at 437, 100 S.Ct. at 2277; *Swin*, 883 F.2d at 249) or by directly subsidizing local industry (*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806, 96 S.Ct. 2488, 2496, 49 L.Ed.2d 220 (1976)), it is generally permitted to act as a normal market participant. As such, the state may use the leverage its investment and position as a market participant afford it to determine with whom and on what terms it will do business.

However, as the Supreme Court has taken care to point out in recent cases, there are limits to this doctrine. In *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), the Court rejected attempts by the State of Alaska to condition sales of its timber on the purchaser's agreement to process the lumber within the State of Alaska. The Court stated that

[t]he limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market. Unless the "market" is relatively narrowly defined, the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with permissible state purpose of fostering local industry.

467 U.S. at 97–98, 104 S.Ct. at 2245. Because the State of Alaska was a participant only in the market for the sale of timber, but was attempting to impose conditions in the wholly-separate timber-processing market, the Court found that the market-participant doctrine was inapplicable and the dormant Commerce Clause barred Alaska's protectionist policy. *See also New Energy Co. v. Limbach*, 486 U.S. 269, 277–78, 108 S.Ct. 1803, 1809–10, 100 L.Ed.2d 302 (1988) (tax credits to fuel dealers only for sales of ethanol which was produced in Ohio not market participation).

In this case, the Authority and Bedford County attempt to bring themselves within the market participant doctrine by broadly defining the relevant market and by equating the individual citizens of the Counties with the Counties themselves and the Authority. First, Defendants claim they are participating in the market "for the long-term disposal of solid waste generated within the tri-county area." (Authority Opp.Br. at 54–55). While this "market" may be the proper focus for purposes of planning municipal or social policy, it clearly is not the proper unit of analysis for purposes of the market participation doctrine. The Supreme Court has made clear that the market participant doctrine applies only to those markets in which a state or local government actually participates. *Wunnicke*, 467 U.S. at 97, 104 S.Ct. at 2245. Further, markets must be narrowly defined to ensure that the market participant excep-

tion does not wholly swallow up the general rule that states may not interfere with the free flow of interstate commerce. *Id.* at 97–98, 104 S.Ct. at 2245.

■ Examined through this filter, it is clear that the "market" in which Defendants claim to participate actually is not one but several separate, albeit not wholly unrelated, markets. Specifically, the market for trash collection and hauling clearly is distinct from the market for trash disposal. Equally clear is the fact that Defendants are not participants in all of these markets. Defendants do not haul waste. Nor, to the extent relevant here, do Defendants purchase waste hauling services. Rather, individual trash generators within the Counties contract for themselves with haulers for the collection and disposal of waste.

Defendants attempt to circumvent the participation requirement by equating the citizens of the Counties with the Authority and the Counties themselves. Analogizing to the equivalence of state and local governments in *Trojan,* Defendants argue that "the citizens of the tri-counties [ ] seek to condition their purchasing of waste collection and hauling services on a seller's agreement to dispose of their waste at the Authority's landfill. They seek to do so, not individually but collectively." (Authority Opp.Br. at 57.) There are several problems with this theory. First, as the Third Circuit noted in *Trojan,* there is substantial precedent for treating state agencies and local governments alike in many respects.

> We find no compelling difference between a local governmental unit and central state agencies. Both exist only through affirmative acts of the State. [*United Bldg. & Constr. Trades Council v. Mayor of Camden,* 465 U.S. 208, 215[, 104 S.Ct. 1020, 1025, 79 L.Ed.2d 249] (1984) ]. Under Pennsylvania law it is clear that local bodies covered by the statute exist only by grace of state authority and with such powers as the state affirmatively provides.

*Trojan,* 916 F.2d at 911. Defendants have cited no case law equating the acts of a state or municipality with the acts of individuals within the locality. It would be difficult indeed for them to argue that the individuals

residing within the Counties have no independent existence apart from the Counties or the Authority. Accordingly, Defendants have not shown that they are participants in the trash hauling market.

Second, if Defendants argument were accepted, it is difficult to see what a locality could not do in the name of its citizens. For example, it would not offend the Commerce Clause if the citizens of Madison, Wisconsin individually decided to purchase only milk which originated and was pasteurized within twenty-five miles of Madison. However, it clearly does violate the Commerce Clause when the City of Madison mandates this result, even if the mandating ordinance represents the will of the citizens of Madison. *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 353, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951). The City of Madison does not participate in the market merely by virtue of the purchases made by its citizens.

Further undermining Defendants' argument is the fact that Defendants do not seek to affect the market as would any other market participant, through the use of market power or leverage. Rather, the Counties and the Authority were able to implement the flow control policy "only because of the regulatory powers they possess as sovereigns ... these are not the types of measures which private participants in the marketplace could implement." *Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Authority,* 814 F.Supp. 1566, 1573 (M.D.Ala. 1993). Defendants have not conditioned the purchase or sale of their goods but have mandated the terms and conditions under which others (i.e. individual citizens and haulers) can contract. This is market regulation and, as such, is subject to the strictures of the Commerce Clause. Thus, the market participant doctrine is inapplicable.

### 2. Exhaustion of Administrative Remedies/Laches

■ Defendants claim that Plaintiffs' claims are barred by the doctrine of laches and by Plaintiffs' alleged failure to exhaust administrative remedies. Laches is "an equitable doctrine" which provides that if a plaintiff in equity has failed to exercise due dili-

gence in prosecuting his claim, to the detriment of the other party, the claim is barred." *Tudor Dev. Group v. United States Fidelity & Guar. Co.,* 768 F.Supp. 493, 495 (M.D.Pa. 1991) (citing *Siegel v. Engstrom,* 427 Pa. 381, 235 A.2d 365, 367 (1967); *Hankin v. Mintz,* 276 Pa.Super. 538, 419 A.2d 588, 590 (1980)), *aff'd,* 968 F.2d 357 (3d Cir.1992). A plaintiff must act to protect its rights within a reasonable time of when it knows or should have known of the violation of those rights. *Id.* If the plaintiff inexcusably delays enforcing its rights and thereby unduly prejudices the defendant, the district court has discretion to bar the action. *Don't Ruin Our Park v. Stone,* 802 F.Supp. 1239, 1245 (M.D.Pa.1992).

█ In this case, Defendants allege that Plaintiffs were aware of, and in some cases participated in, the Counties' waste disposal planning process from its inception. Defendants allege that Plaintiffs not only failed to object to the Plan, but actively supported it. Defendants allege that they detrimentally changed their position by investing funds to construct the landfill at least partially in reliance on Plaintiffs' acquiescence in the Plan.

Initially, there are disputed issues of fact regarding whether laches even applies to the Haulers Association, Howell Trucking, or Queen City Leasing. The Haulers Association did not come into existence until 1993, well after both versions of the Plan were adopted, the Ordinances were passed and the Authority landfill was up and running. It is not clear whether all of the Associations' members took part in the development of the Plan or approved of it. While Defendants allege that all Plaintiffs were involved in the planning process or at least should be charged with knowledge of it, Plaintiffs allege that Howell Trucking had nothing to do with the planning process and that Queen City Leasing did not begin hauling in the Counties until after the flow control policy was in place.

Further, individuals such as Ralph E. Park, Vice–President of Park Garbage Service, Inc., allege that they supported the Plan on the understanding that the Authority landfill would charge competitive prices. (Park Dep. at 82–83, Pls.' Reply, Ex. 2.)

Park insists that the fact that the Authority would charge a substantial premium over market rates, harming the haulers, did not become known until much later. Plaintiffs argue that they did not unduly delay filing the instant action once the harm to them was known. On the state of the record, the court is not persuaded that the doctrine of laches should bar Plaintiffs' claims.

█ The requirement that parties exhaust administrative remedies before resorting to court is not an "inexorable command, but is a matter of sound judicial discretion." *Cerro Metal Prods. v. Marshall,* 620 F.2d 964, 970 (3d Cir.1980). In this case, the court is not persuaded that the purposes served by the exhaustion requirement would be thwarted if Plaintiffs' claim is permitted to go forward. Hearing Plaintiffs' action will not cause a premature interruption of the administrative process, because the Plan has been approved and the time for administrative appeal has run. *First Jersey Sec., Inc. v. Bergen,* 605 F.2d 690, 695 (3d Cir.1979) (one purpose of exhaustion requirement is to avoid premature interruption of administrative process and to avoid piecemeal appeals of administrative determinations), *cert. denied sub nom. First Jersey Secur., Inc. v. Biunno,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Nor is this a case where the issue to be decided—the constitutionality of Defendants' flow control policy—is within the peculiar expertise of the agency. *Id.* (exhaustion requirement permits agency to make decisions within its areas of expertise). Further, it is not clear that the administrative remedies are adequate under the circumstances of this case. Plaintiffs allege that, to the extent that they supported the Plan, their support was in reliance on statements from various County officials that the Authority would charge market rates. Plaintiffs allege that because of these representations, they did not know the nature or extent of harm they would suffer when the Plan was adopted. They argue that the harm only became clear once the Authority landfill began operations, the Authority Rules were adopted and the Authority began to charge substantially above-market tipping fees. At this point, the time for filing an administrative appeal had

passed. Under these circumstances, the court does not find Defendants' exhaustion argument persuasive.

### 3. Congressional Authorization of Flow Control

Defendants Fulton and Huntingdon Counties argue that Congress impliedly authorized flow control ordinances such as the Authority Rules through passage of the Resource Conservation and Recovery Act of 1976 (RCRA), 90 Stat. 2813, as amended, 42 U.S.C. § 6941 *et seq.,* and its amendments. Essentially the same argument was raised in *Carbone* and thoroughly discussed by Justice O'Connor in her concurring opinion. *Carbone,* 511 U.S. at ———–———, 114 S.Ct. at 1691–92. The argument fails for the reasons articulated in that opinion.

### II. Defendants' Motion for Summary Judgment as to Park's Garbage Services, Inc.

The Authority and Bedford County have moved for summary judgment with respect to Park's Garbage Services, Inc. (Park's Garbage"). Park's Garbage has not alleged that the Authority Rules interfere with its taking waste out-of-state, but only that, in the absence of the rules, it would take waste collected within the Counties to the RCC landfill in Somerset County, Pennsylvania. Thus, Defendants claim that Park's Garbage has shown no effect on interstate commerce, but only on intrastate commerce, a legitimate object of regulation by the Counties and the Authority.

As Defendants note, the dormant Commerce Clause applies to intrastate commerce to the extent that it burdens interstate commerce. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 349–50, 97 S.Ct. 2434, 2444–45, 53 L.Ed.2d 383 (1977). However, Park's Garbage has not shown that the waste it collects is bound for interstate commerce. Nor is the court persuaded that it has shown that a ban on delivering waste to other in-state disposal facilities would be a "*de facto* export mandate" as Plaintiffs claim. (Pls.' Opp.Br. at 3.) However, because the court has denied Plaintiffs' summary judgment motion and the case will now go to trial, the court will permit Plaintiffs an opportunity to support their claims in this respect at trial. Accordingly, Defendants' motion for summary judgment with respect to Park's Garbage will be denied.

An appropriate order will be issued.