## XCALIBER INTERNATIONAL LIMITED, LLC, et al.

### v.

### Richard P. IEYOUB, in his Official Capacity as Attorney General, State of Louisiana

### No. CIV.A. 04-0069.

United States District Court, E.D. Louisiana.

Feb. 4, 2005.

Kyle Melbourne Keegan, Roy, Kiesel, Keegan & DeNicola, Baton Rouge, LA, Anthony F. Troy, Ashley Taylor, Bryan Haynes, Jason Hicks, Troutman Sanders, LLP, Richmond, VA, Christopher D. Kiesel, Roy, Kiesel, Keegan & DeNicola, Baton Rouge, LA, Ernest Gellhorn, Ernest Gellhorn, Attorney at Law, Washington, DC, for Xcaliber International Limited, LLC, CigTec Tobacco LLC, Carolina Tobacco Company, Plaintiffs.

Thomas L. Enright, Jr., Louisiana Department of Justice Attorney General's Office, Baton Rouge, LA, Arlene Denise Knighten, Louisiana Department of Insurance, Baton Rouge, LA, for Richard Ieyoub in his official capacity as Attorney General, State of Louisiana, Charles C Foti, Jr in his official capacity as Attorney General, State of Louisiana, Defendants.

### ORDER AND REASONS

LEMMON, District Judge.

**IT IS ORDERED** that the motion to dismiss filed by the State of Louisiana (Document 3) is hereby **GRANTED**.

#### A. Background.

Plaintiffs Xcaliber International Limited, L.L.C., CigTec Tobacco, L.L.C., and Carolina Tobacco Company each manufacture tobacco products that are distributed in Louisiana. In the mid–1990s, Louisiana and other states filed suit against major tobacco manufacturers seeking to recover the cost of medical services that had been provided to smokers. In 1998 these states signed a Master Settlement Agreement with four major tobacco manufacturers.[1] Under the terms of the Agreement, the states agreed to release their claims against the settling defendants, referred to in the Agreement as the "participating manufacturers," in return for an annual payment, fixed at $4.5 billion in 2000, and increasing yearly until reaching $9.0 billion per annum. Each participating manufacturer's responsibility for these payments was "based principally on a Participating Manufacturer's relative national market share."[2] The annual payment was to be allocated to each state based on a fixed formula, with Louisiana receiving approximately 2.26 % of the total national payments.[3]

The Agreement includes bans on the participating manufacturers' political lobbying, restrictions on trade association activities, and the relinquishment of legal challenges to state laws regulating tobacco. The Agreement also contained a variety of prohibitions on advertising and promotional activities, such as advertisements aimed at the youth market; outdoor advertisements; transit advertisements; and advertisements containing cartoons.[4]

In order to neutralize any cost disadvantage that the participating manufacturers would experience in comparison to those not participating in the settlement, the Agreement requires each participating state to enact certain related legislation, which in Louisiana is codified at LSA–R.S. 13:5061–5063. Under the terms of the original Louisiana statute every tobacco manufacturer selling cigarettes in Louisiana was required either to (1) sign the Agreement and become a participating manufacturer, or (2) deposit a specified sum per cigarette sold in Louisiana into an escrow account.[5] The sum deposited into

---

1. The original participating manufacturers under the Agreement were Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Philip Morris Incorporated, and R.J. Reynolds Tobacco Company.

2. Complaint at ¶ 10.

3. *Id.* at ¶¶ 9–11.

4. *Id.* at ¶ 11; *see generally* Agreement at Part III.

5. LSA–R.S. 13:5063.

the escrow account by nonparticipating manufacturers is a set amount per unit sold (defined as the number of "individual cigarettes sold in the state"), increasing from approximately .009 cents per unit sold in 1999 to approximately .018 cents per unit sold in 2007 and thereafter. The amount held in escrow either would be released to the state in payment of any judgment obtained against the tobacco manufacturer in a suit brought by the state or in settlement of a claim by the state against the tobacco manufacturer, or returned to the nonparticipating manufacturer if 25 years passed without such a judgment or settlement.[6] The statute also contained the following provision:

> (b) To the extent that a tobacco product manufacturer establishes that **the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement** (as determined pursuant to section IX(I)(2) of the Master Settlement Agreement, and before any of the adjustments or offsets described in section IX(j)(3) of that agreement other than the inflation adjustment) had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer (emphasis added).

LSA–R.S. 13:5063 C.(2)(b).

Defendant contends that this original version of the statute contained an "unintended loophole."[7] If a nonparticipating manufacturer distributed its products nationally in states that had passed similar tobacco statutes, its total escrow obligation to those states would approximate the total payments that it would have been required to make under the Agreement. However, if a nonparticipating manufacturer were to concentrate its sales in only one or a few states, it could recoup its escrow payments for all but those states' allocable percentages under the Agreement. For example, under the original statute, a nonparticipating manufacturer selling 100% of its cigarettes in Louisiana would be able to obtain a release of all but 2.26 % of its escrow payment to Louisiana, and would have no other escrow obligation to other states. However, a participating manufacturer, regardless of the number of states in which it sold its products, would have to pay the full amount of its obligation under the Agreement, to be distributed among the various states.

To remedy the unintended competitive advantage given to nonparticipating manufacturers who concentrated their sales in one or a few states, in 2003 Louisiana amended LSA–R.S. 13:5063. Under the amended statute:

> (b) To the extent that a tobacco product manufacturer establishes that **the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the Master Settlement Agreement payments**, as described pursuant to section IX(I) of that agreement, including after final determination of all adjustments, that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer (emphasis added).

Plaintiffs, who are nonparticipating manufacturers, allege that the "effect of the Amendment is to eliminate any refund of escrowed overpayments," and that "a

---

6. LSA–R.S. 13:5063 C. (2)(a), (c).

7. Document 3 at 8–9.

Non–Participating Manufacturer's escrow payments for sales in Louisiana will be greater than that required if it were a Participating Manufacturer under the MSA." [8] Plaintiffs allege that the "purpose, design and effect" of the amendment is "to coerce Plaintiffs and other Non–Participating Manufacturers into joining the [Agreement], becoming Participating Manufacturers, and waiving their constitutionally protected rights under the First Amendment." [9] Plaintiffs allege that if they do not accede to the Agreement, they will be punished because they will be denied "refunds on escrow payments that exceed the amount they would have paid to Louisiana under the MSA." [10] Plaintiffs allege this was done to "prevent Non–Participating Manufacturers from competing against Participating Manufacturers, thereby preserving (and increasing) the market shares and profit margins of Participating Manufacturers—and also protecting the payments received by the Settling States under the MSA." [11]

Plaintiffs filed suit on January 12, 2004 against the Louisiana Attorney General, seeking a judgment declaring the amended statute to be unconstitutional on its face and as applied to them. They allege that the amended statute (1) violates their rights under the First Amendment, the Fourteenth Amendment, and the Commerce Clause of the United States Constitution; and (2) violates their rights under Article I, Sections 2, 3, 7, 9, 19, and 22 of the Louisiana Constitution.[12] Defendant has moved to dismiss each of these claims under Rule 12(b)(6), and has moved to dismiss plaintiff's suit based on filing in an improper venue.

**B. Analysis.**

**1. Rule 12(b)(3) motion to dismiss for improper venue.**

■ Defendant argues that plaintiffs have filed suit in an improper venue because the only proper venue for a suit against the Louisiana Attorney General is the Middle District of Louisiana, the district of his domicile.

Plaintiffs allege federal subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a) and 42 U.S.C. § 1983 (civil rights), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 2201 (declaratory judgments).[13] 28 U.S.C. § 1391(b) provides that if federal subject matter jurisdiction is not based solely on diversity, venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Plaintiffs have submitted an affidavit from an owner of Cig-Tec Tobacco attesting that at least 13% of its sales occur in the Eastern District, and an affidavit from the President of Carolina Tobacco attesting that approximately 35% of its sales occur in this district. It is the sale of these products that forms the basis for computing the sum that must be deposited into the escrow account. The court finds that because a substantial part of the events giving rise to plaintiff's claim occurred in this district, venue is proper. Defendant's motion to dismiss for improper venue is denied.

**2. Rule 12(b)(6) motion to dismiss for failure to state a claim.**

**a. Rule 12(b)(6) standards.**

In analyzing a Rule 12(b)(6) motion, the court must "accept as true all well-pleaded

---

**8.** Complaint at ¶¶ 18–19.

**9.** *Id.* at ¶ 22.

**10.** *Id.*

**11.** *Id.* at ¶ 23.

**12.** Complaint at ¶¶ 27–39.

**13.** *See* Complaint at ¶ 6.

facts, and view them in the light most favorable to the non-moving party." *Word of Faith World Outreach Center Church, Inc. v. Sawyer,* 90 F.3d 118, 121 (5th Cir. 1996), *cert. denied,* 520 U.S. 1117, 117 S.Ct. 1248, 137 L.Ed.2d 329 (1997). "Unless it appears 'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,' the Complaint should not be dismissed for failure to state a claim, and leave to amend should be liberally granted." *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993). Additionally, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Id.*

### b. Count One: violation of the First Amendment of the United States Constitution and Article I, §§ 7 and 9 of the Louisiana Constitution.[14]

■ Count One alleges:

The Amended Qualifying Statute violates the First Amendment to the United States Constitution and Article I, Sections 7 & 9 of the Louisiana Constitution. The Amended Qualifying Statute coerces Plaintiffs and other Non-Participating Manufacturers into relinquishing their constitutionally protected First Amendment rights of speech, association and petition, penalizes them for asserting and refusing to waive such rights, conditions the receipt of a government entitlement and benefit on the waiver of such rights, and imposes an unlawful prior restraint on speech.[15]

Plaintiffs' claim is based on the "unconstitutional conditions" doctrine. In *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court explained the scope of this doctrine:

For the last quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

*Id.* at 597, 92 S.Ct. 2694; *see also Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (because "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the

---

14. Although the Supreme Court of Louisiana "must always consider whether" the state constitution offers "greater or different protections in any given circumstance," in general it "has consistently interpreted the protections offered by Article I, §§ 7 and 9 of our constitution as coextensive with those of the First Amendment to the United States Constitution." *City of Baton Rouge v. Ross,* 654 So.2d 1311, 1335 n. 13 (La.1995) (Calogero, J., concurring); *see also Byers v. Edmondson,* 826 So.2d 551, 554 n. 4 (La.App. 1st Cir.) ("The free speech guarantees contained in the First Amendment are the same free speech guarantees contained in Article I, § 7 of the Louisiana Constitution of 1974."), *writ denied,* 826 So.2d 1131 (La.2002). Additionally, plaintiffs do not contest defendant's motion to dismiss their claim under La. Const. art. I, § 9, which governs the right of assembly and petition.

15. Complaint at ¶ 30.

exercise of First Amendment rights," the government " 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit."). "The point" of the unconstitutional conditions doctrine "is the government's duty not to punish protected speech, not the citizen's supposed 'right' to governmental patronage." *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 125 S.Ct. 102, 160 L.Ed.2d 121 (2004).

■ Defendant argues that a resolution of the legal inquiry into whether there is a constitutional violation depends factually on "whether an NPM's escrow obligation for its sales in Louisiana exceed what its MSA obligation for those same cigarette sales would have been as a PM. The amended Escrow Statute ensures that that cannot happen."[16] Defendant contends that a comparison between the amount that a nonparticipating manufacturer must pay under the escrow statute and the amount that manufacturer would have to pay if it were a participating manufacturer under the Agreement illustrates that nonparticipating manufacturers are not being penalized for refusing to sign the Agreement. Therefore, defendant argues, no benefit is being unconstitutionally withheld from plaintiffs because they have refused to sign the Agreement.

Plaintiffs argue that the proper comparison is between (1) the total amount of money a nonparticipating manufacturer must pay to Louisiana as its escrow obligation under the amended revised statute for cigarettes sold in the state, and (2) the amount of money *allocated to Louisiana* that the nonparticipating manufacturer would have to pay under the Agreement, and that under that comparison, the amount it must pay exceeds what it would have been obligated to pay to Louisiana as a participating manufacturer.

The focus of the unconstitutional conditions doctrine is on whether Louisiana is denying a benefit to plaintiffs that they could obtain by giving up their freedom of speech, or is penalizing plaintiffs for refusing to give up their First Amendment rights. The court finds the amended escrow statute leaves plaintiffs no worse off financially than they would be under the Agreement, and plaintiffs retain all of the First Amendment and other rights that the participating manufacturers relinquished by signing the Agreement. Because defendant is neither denying a benefit to plaintiffs that they could obtain by giving up their freedom of speech, nor is it punishing plaintiffs for refusing to give up their free speech rights, the unconstitutional conditions doctrine does not apply. Defendant's motion to dismiss plaintiffs' claim for violation of the First Amendment to the United States Constitution and Article I, Sections 7 & 9 of the Louisiana Constitution is granted.

**b. Count Two: violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 3 of the Louisiana Constitution.**

■ Count Two alleges that the amended escrow statute violates plaintiff's right to equal protection:

The classification system contained in the Amended Qualifying Statute violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 3 of the Louisiana Constitution.

\* \* \* \* \* \*

---

**16.** Document 3 at 13.

No reason can justify requiring Non–Participating Manufacturers to make greater payments than Participating Manufacturers, nor to impose, as a cost of doing business in Louisiana, a national rather than state cost.[17]

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has held that the Equal Protection Clause:

> is essentially a direction that all persons similarly situated should be treated alike. Section 5 of this Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is **rationally related to a legitimate state interest**. When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citations omitted) (emphasis added); *see also Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes funda-

mental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Additionally, under the Louisiana Constitution, a law that does not classify on a suspect basis[18] is unconstitutional if "a member of a disadvantaged class shows that it does not suitably further any appropriate state interest." *State v. Expunged Record (No.) 249,044*, 881 So.2d 104, 110 (La.2004).

The court finds that the amended escrow statute is rationally related to a legitimate state interest. Louisiana has legitimate interests in redressing the health care costs unquestionably emanating from cigarette smoking and in ensuring that there are adequate funds to pay any judgment rendered in its favor against nonparticipating cigarette manufacturers. The amended escrow statute rationally imposes payment obligations on nonparticipating manufacturers to further these interests, and the distinction between participating manufacturers, whose payments are made into a fund distributed to each state, and nonparticipating manufacturers, whose payments are held in escrow for 25 years, "[t]o pay a judgment or settlement" that is "brought against such tobacco manufacturer by the state,"[19] is reasonable. The amended escrow statute rationally ensures that nonparticipating manufacturers do not escape liability for the potential health costs associated with their manufacture and distribution of tobacco products. Accordingly, defendant's motion to dismiss plaintiffs' claim for violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitu-

---

17. Complaint at ¶¶ 32–33. The quoted portions of paragraphs 32 and 33 relate to plaintiffs' equal protection argument. The balance is germane to plaintiffs' First Amendment argument, which is treated in Section B. 2. b.

18. Suspect bases include race, religion, birth, age, sex, culture, physical condition, or political ideas or affiliations. *See* La. Const. Art. I, § 3.

19. LSA–R.S. 13:5063 C. (2)(a).

tion and Article I, Section 3 of the Louisiana Constitution is granted..

### c. Count Three: Violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article I, Sections 2, 19, and 22 of the Louisiana Constitution.[20]

██ Count Three of the Complaint alleges that defendant has violated plaintiffs' rights under the due process clauses of the federal and state constitution:

> By requiring plaintiffs to place excess funds beyond the amount required by the original Qualifying Statute into escrow, which will not be refunded until 25 years later, the Amended Qualifying Statute constitutes an unwarranted prejudgment seizure of Plaintiff's property that fails to provide procedural safeguards otherwise required for prejudgment seizures. There is no notice or hearing prior to the excess payment or any mechanism for judicial review of the lawfulness of the state's retention of the excess payments after the seizure. The State is not required to make charges or bring accusations against Plaintiffs before securing the funds and its theories

of liability or application to Plaintiffs are never tested in a hearing or on judicial review.

Since the Amended Qualifying Statute deprives Plaintiffs of their property without providing any procedural protections to guard against erroneous deprivation, it constitutes a violation of Due Process guaranteed by the Fourteenth Amendment to the Unites State Constitution and Article I, Sections 2, 19, and 22 of the Louisiana Constitution.[21]

Defendant argues that because the amended escrow statute only operates to hold plaintiffs' payments in escrow and not to convert them to the state's property, there has been no "seizure," and due process requires only that a plaintiff be given a post payment hearing at which the Louisiana Attorney General is required to show cause why the escrow payments should not be released.[22]

The Supreme Court has held that it is a "truism" that due process, "'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Connecticut v. Doehr*, 501 U.S. 1, 10, 111 S.Ct. 2105, 115

---

**20.** The due process clause of the Louisiana Constitution, La. Const. art. I, § 2, is "coextensive" with that of the federal constitution, and provides "the same due process protection." *State v. Smith*, 614 So.2d 778, 780 (La.App. 2d Cir.1993); *see also State v. Mussall*, 523 So.2d 1305, 1309 ("Our state constitution's due process clause is virtually identical to its Fourteenth Amendment model."). Additionally, La. Const. art. I, § 19 provides for a right to judicial review, and § 22 provides for access to the courts. Plaintiffs do not oppose defendant's motion to dismiss their claims under these two provisions.

**21.** Complaint at ¶¶ 35–36.

**22.** Relying on *County Line Joint Venture v. City of Grand Prairie*, 839 F.2d 1142 (5th Cir.1988), *cert. denied*, 488 U.S. 890, 109 S.Ct.

223, 102 L.Ed.2d 214 (1988), defendant also argues that plaintiffs have no procedural due process rights because its conduct was legislative. *County Line* is distinguishable because it involved a zoning decision, and the Fifth Circuit's analysis was limited to the zoning context. *See id.* at 1143–44 ("In an attempt to delineate the relationship between property owners' rights and zoning ordinances, courts and commentators indicate that the existence of procedural due process rights depends upon how the court views zoning ordinances and decisions. The City asserts that this court should view the City's conduct in adopting and applying [the challenged zoning ordinance] as a legislative act. Generally, if the court views the government conduct as legislative, the property owner has no procedural due process rights.").

L.Ed.2d 1 (1991) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The "central meaning" of procedural due process is that " '[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.' " *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Additionally, "it is now well settled that temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Id.* at 86, 92 S.Ct. 1983.

In determining the circumstances that justify an exception to the general rule that a predeprivation hearing must take place, the Supreme Court has examined "the competing interests at stake, along with the promptness and adequacy of later proceedings." *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993); *Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 2646, 159 L.Ed.2d 578 (2004). In conducting this examination, the Court has adopted a threefold test requiring:

> consideration of "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards" and lastly "the government's interest, including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

**23.** LSA–R.S. 13:5063 C.(2)(a).

*Doehr,* 501 U.S. at 10, 111 S.Ct. 2105 (quoting *Mathews,* 424 U.S. at 335, 96 S.Ct. 893).

The court finds that, under the *Mathews* balancing test, procedural due process does not require that the state conduct a hearing before requiring nonparticipating manufacturers to place funds in escrow. There is no question that the nonparticipating manufacturers have an interest in their revenue, and this interest is affected by requiring them to contribute to the escrow fund. However, there is no risk of an erroneous deprivation of the escrowed funds, nor is there any value of the additional safeguard of having a predeprivation hearing. The funds placed in escrow are not owned by the state, which pays interest to the nonparticipating manufacturers on the amount in escrow. It is undisputed that the state has incurred and will incur significant health care costs related to tobacco use. The state has successfully ensured payment by participating manufacturers of costs to the state for tobacco-related illnesses through the settlement with the participating manufacturers. The purpose of the escrow fund is to ensure that any judgment rendered against or settlement with the nonparticipating manufacturers for their responsibility for such health care costs will be collectable, and the escrowed funds may be obtained by the state only "to pay a judgment or settlement" [23] if it elects to bring such a suit or claim. If it does not do so, the funds are released after 25 years to the nonparticipating manufacturers.

Plaintiffs argue that there should be an "inquiry to determine whether there is a reasonable possibility of judgments against Plaintiff[s] in the amounts that are withheld from Plaintiff[s] *before* the excess deposits are made." [24] However, jurispru-

**24.** Document 9 at 33–34 (emphasis in original).

dence provides that when property rights are at stake, due process requirements are met if there is an adequate opportunity given for an ultimate judicial determination of liability. *See Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) ("The usual rule has been '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.'") (quoting *Phillips v. Commissioner*, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931)). It is uncontested that to obtain the escrowed funds, the state must either reach a settlement with plaintiffs or obtain a favorable "judicial determination of liability." Plaintiffs do not identify what additional protections a predeprivation hearing would provide, considering that, absent a settlement, they will have the opportunity to fully litigate any defenses to liability in court before the state may have access to the escrowed funds. The requirement of a successful lawsuit provides necessary and important procedural safeguards to nonparticipating manufacturers. Additionally, the state would be forced to bear fiscal and administrative burdens if predeprivation hearings were required, which are unjustified considering that there is no risk of an erroneous deprivation of the escrowed funds and that other procedural safeguards exist.

Accordingly, because procedural due process does not require a predeprivation hearing in this case, defendant's motion to dismiss plaintiffs' claim for violation of the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, Sections 2, 19, and 22 of the Louisiana Constitution is granted.

25. Complaint at ¶¶ 38–39.

### d. Count Four: Violation of the Commerce Clause of the United States Constitution.

Count Four of the Complaint alleges that the amended escrow statute violates the Commerce Clause:

Plaintiffs are out-of-state entities with no physical presence in Louisiana and no substantial nexus with Louisiana. The Amended Qualifying Statute imposes a national cost on doing business within the state. The Amended Qualifying Statute requires Plaintiffs to pay the entire national share in their escrow payments to Louisiana without refund of such excess payments.

The Amended Qualifying Statute violates the Commerce Clause contained in Article I, Section 8 of the United States Constitution because the amended statute unjustifiably burdens interstate commerce of Non–Participating Manufacturers.[25]

The Commerce Clause to the United States Constitution gives the United States Congress the power to "regulate commerce ... among the several states." U.S. Const. Art. I, § 8, cl. 3. Under the "dormant" or "negative" aspect of the Commerce Clause, states may not "unjustifiably ... discriminate against or burden the interstate flow of articles or commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The test for analyzing claims under the "dormant" commerce clause is well established:

[T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against

interstate commerce." As we use the term here, "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually *per se* invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Oregon Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345; *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (promulgating test).

Plaintiffs argue that their Commerce Clause claim should be judged by the standards announced in cases such as *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) and *Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). These cases, however, involved the "limits" the Commerce Clause placed "on the taxing powers of the States." *Quill*, 504 U.S. at 305, 112 S.Ct. 1904. The amended escrow statute does not impose a tax on tobacco manufacturers, rather an escrow payment which may be accessed by the state only if it obtains a judgment against or enters into settlement with the manufacturer. Because the amended escrow statute is not a tax or other "revenue-raising measure designed to line the State's coffers," the test utilized by the *Quill/Complete Auto Transit* line of cases does not apply. *Star Scientific, Inc. v. Carter*, 2001 WL 1112673, at *9 (S.D.Ind. Aug.20, 2001); *see also American Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1254–55 (10th Cir.) (holding that because *Quill* and related cases "concern the levy of *taxes* upon out-of-state entities," they govern only the analysis of tax burdens)

(emphasis in original), *cert. denied*, 531 U.S. 811, 121 S.Ct. 34, 148 L.Ed.2d 14 (2000); *Ferndale Lab., Inc. v. Cavendish*, 79 F.3d 488, 494 (6th Cir.1996) (holding that because "virtually every precedent relied upon by the Court in deciding *Quill* was concerned with attempts by states to tax interstate commerce," *Quill* applies only if a state attempts to tax interstate transactions).

A law is a discriminatory violation of the commerce clause if it "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Oregon Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345. In this case, the amended escrow statute does not discriminate against interstate commerce. The amended statute imposes an escrow requirement only on units sold, which are defined in the statute as the "number of individual cigarettes sold in the state."[26] The statute does not impose any escrow obligation on sales occurring outside of Louisiana, nor does it impose a more onerous obligation on cigarettes imported into Louisiana from other states than it does on cigarettes that are manufactured in Louisiana and sold in this state. Additionally, assuming that a Louisiana tobacco manufacturer sells the same amount of cigarettes in the same states as an out-of-state manufacturer, the two manufacturers would have to make the same payment, and would be entitled to the exact same amount of refund.

Because the amended escrow statute is not discriminatory, the key issue is whether "the burden imposed on such [interstate] commerce is clearly excessive in relation to the putative local benefits." *Oregon Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345. The amended statute places no burden on interstate commerce whatsoever, requiring only that nonparticipat-

---

**26.** LSA–R.S. 13:5062(10).

ing manufacturers pay to Louisiana a per unit sum based solely on sales occurring in this state. Any alleged burden would be plainly outweighed by the benefit afforded to Louisiana by the escrow statute, which ensures a fund is available to the state in the event it obtains a judgment against or a settlement with a nonparticipating manufacturer.

Accordingly, because the amended escrow statute does not violate the Commerce Clause, defendant's motion to dismiss plaintiff's Commerce Clause claim is granted.

## C. Conclusions.

Defendant's motion to dismiss is granted.